DAVID ROSENFELD
Associate Regional Director
New York Regional Office
Attorney for Plaintiff
Securities and Exchange Commission
3 World Financial Center – Suite 400
New York, New York 10281-1022
(212) 336-1100

'09 CIV 6458

RECEIVED JUL 21 2009 U.S.D.C. S.D.N.Y. CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,       :
                                          :
                              Plaintiff,  :   Civ. No.
                                          :
              - against -                 :
                                          :   COMPLAINT
DEBORAH DUFFY,                            :
                                          :
                              Defendant.  :
-----------------------------------------------------------------x

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendant Deborah Duffy ("Duffy" or "Defendant"), alleges as follows:

## SUMMARY

1.  The Commission brings this action against Duffy, who is the former Chief Compliance Officer of WG Trading Company Limited Partnership ("WGTC"), a registered broker-dealer, for her role in assisting the general partners of WGTC perpetrate a multi-million dollar securities investment fraud. The fraud resulted in the misappropriation of nearly $554 million of investors' assets that were supposed to be invested in a relatively "risk-free" trading strategy at WGTC. The victims of the fraud were large institutional investors, including several public pension funds and educational institutions and endowments. On February 25, 2009, the

Commission sued WGTC and its general partners, Paul Greenwood ("Greenwood") and Steven Walsh ("Walsh"), and others, by filing an emergency civil action in this Court to shut-down the fraudulent investment scheme. SEC v. WG Trading Investors, L.P., et al., 09-cv-1750 (S.D.N.Y.) (GBD). As alleged below, for nearly a decade, Duffy knowingly aided and abetted Greenwood and Walsh in perpetrating their investment fraud.

## VIOLATIONS

2. By virtue of the conduct alleged herein, Defendant is liable, pursuant to Section 20(e) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78t(e)], for aiding and abetting:

   a. Greenwood and Walsh's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

   b. Greenwood and Walsh's violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 (the "Advisers Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

3. The Commission brings this action pursuant to the authority conferred upon it by Sections 20(e) and 21(d)(1) of the Exchange Act [15 U.S.C. §§ 78t(e) and 78u(d)(1)] and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], seeking to permanently restrain and enjoin Duffy from aiding and abetting violations of the federal securities laws, ordering Duffy to disgorge any ill-gotten gains and to pay prejudgment interest thereon, and ordering Duffy to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §§

78u(d)(3)].

## JURISDICTION AND VENUE

4.  This Court has jurisdiction over this action pursuant to Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

5.  Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391. Duffy, directly and indirectly, made use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices and courses of business alleged herein. A substantial part of the events giving rise to the Commission's claims occurred in this judicial district and many of the transfers of funds by Duffy were to recipients in this district. In particular, WGTC is a member firm of The New York Stock Exchange, which is located in this district, and Duffy transferred funds to financial institutions headquartered in this district.

## DEFENDANT

6.  **Duffy**, age 53, resides in Mahwah, New Jersey. She was until February 2009, the Chief Compliance Officer of WGTC, a broker dealer registered with the Commission. Duffy was also a registered representative associated with WGTC and held Series 7, 24 and 63 licenses.

## RELATED ENTITIES AND INDIVIDUALS

7.  **Greenwood**, age 61, resides in North Salem, New York. During the course of the fraudulent investment scheme, Greenwood was an investment adviser and served as the co-general partner, Chief Operating Officer and Chief Financial Officer of WGTC. He was also a minority owner and control person of Westridge Capital Management, Inc. ("Westridge").

3

Greenwood was also co-general partner, along with Walsh, of WGTI. Greenwood held Series 3 and 63 licenses.

8. **Walsh**, age 64, resides in Sands Point, New York. During the course of the fraudulent investment scheme, Walsh was an investment adviser and served as the co-general partner, Chief Executive Officer and the senior registered options principal of WGTC. He was also a minority owner and control person of Westridge. Walsh was also a co-general partner, along with Greenwood, of WGTI. Walsh held Series 3, 4 and 40 licenses.

9. **WG Trading Investors, L. P. ("WGTI")** is a Delaware limited partnership with its principal office located in Greenwich, Connecticut. During the course of the fraudulent investment scheme, the general partners of WGTI were Greenwood and Walsh. WGTI was an investor and limited partner in WGTC. WGTI had no independent business operations or activities, but merely served as a "pass-through" investment vehicle for certain investors and clients of Westridge.

10. **WGTC** is a Delaware limited partnership and a registered broker dealer with its principal office in Greenwich, Connecticut, and other offices in Jersey City, New Jersey and North Hills, New York. During the course of the fraudulent investment scheme, the general partners of WGTC were Greenwood and Walsh. Investors in WGTC were granted limited partnership interests in WGTC. Investor clients of Westridge invested in WGTC via WGTI in one of two ways: (i) by investing with WGTI directly or (ii) by investing in a feeder fund, which invested directly with WGTI.

11. **Westridge** is a Delaware corporation located in Santa Barbara, California and is an investment adviser registered with the Commission. During the course of the fraudulent

investment scheme, Westridge was owned by Greenwood, Walsh and one other individual, who also served as its Director and Chief Compliance Officer. Greenwood and Walsh were control persons of Westridge. Westridge provided investment advisory services and maintained separately managed accounts for other clients who wished to invest in the "enhanced index" strategy.

## FACTS

### Greenwood and Walsh Perpetrated A $554 Million Investment Fraud

12. From at least 1996 to February 2009, Greenwood and Walsh fraudulently marketed to institutional investors, including several public pension funds and educational institutions and endowments, an "enhanced equity index management" trading strategy that consisted of two investment components. The first investment component was exposure to a stock index, such as the S&P 500, through futures trading at Westridge. Westridge managed this aspect of the trading strategy and purchased long positions in equity index futures that provided exposure to the entire index. Westridge required that 5% of an investor's assets be apportioned to this strategy. Because the account was highly leveraged, this 5% collateralized twenty times as much exposure to the chosen futures index. Westridge further required 10% of the investor's assets to be retained for margin management purposes associated with the futures position. The second investment component was "enhanced cash management" through exposure to an index arbitrage trading strategy at WGTC. Pursuant to this strategy, which Greenwood and Walsh claimed to be relatively "risk free," S&P 500 or other futures were sold short and the underlying equities in the index were purchased long in an arbitrage transaction that locked in a stated rate of interest for a given period of time. Depending on market conditions, the reverse strategy may

have been executed; that is, selling the underlying equities short and purchasing the futures long.

13. The 85% of investors' funds designated for the index arbitrage strategy was invested, in the first instance, with WGTI. The investor received a promissory note from WGTI reflecting the principal investment. These notes were generally signed by Greenwood on behalf of WGTI.

14. The WGTI promissory notes to certain Westridge clients clearly stated that WGTI would send the investors' money to WGTC for use in the index arbitrage trading strategy. The notes stated: "The Borrower [WGTI] shall invest each borrowing of Original Principal in a limited partnership interest in WG Trading Company Limited Partnership . . . ." Some of these promissory notes were re-written sometime after 2002 to make reference to the payment of interest on the principal investment at a rate equal to a "hypothetical" investment in WGTC.

15. Even though Greenwood and Walsh appear to have altered the language of the promissory notes somewhat to make reference to a "hypothetical" return, they continued to tell investors in meetings and in marketing materials that the 85% portion of the investors' assets designated for the stock index arbitrage strategy would "pass through" WGTI and be invested in WGTC.

16. Among the many false representations Greenwood and Walsh made to investors and potential investors are those found in their marketing and promotional materials, including the following:

    a. "The remaining [85%] of cash available is allocated to the Equity Index Arbitrage, in order to generate the enhancement";

    b. "Remaining 85% invested in index arbitrage enhanced cash management";

    c. "As of June 30, 2006, . . . 80% [of the funds] are managed by WG Trading

[Company] in an index arbitrage cash enhancement strategy";

d. "There is no [market] timing as portfolios are fully invested... [c]ash per se is fully invested at all times in either the Westridge liquidity pool supporting the index exposure or the equity index arbitrage exposure";

e. "[T]he 85% invested in the equity index arbitrage which [sic] is 100% fully invested in stocks and futures"; and

f. "For every $100.00 invested in the strategy... $85.00 [is] [i]nvested in the cash enhancement strategy (Equity Index Arbitrage)."

17. Greenwood and Walsh made many misrepresentations to investors and potential investors, particularly that 85% of investor assets would be "fully" invested in WGTC for use in the index arbitrage trading strategy.

18. Rather than "fully" investing the 85% of investor assets in WGTC for use in the index arbitrage trading strategy, as they stated they would do, Greenwood and Walsh invested a mere fraction of this money in WGTC and simply misappropriated the rest to themselves and their families.

19. WGTI's balance sheet, dated as of December 31, 2008, showed that of the $667 million in total investor contributions in WGTI, Greenwood and Walsh had caused WGTI to invest only $94 million in WGTC for use in the index arbitrage trading strategy. The $573 million difference between the investors' total contributions and the investment in WGTC was reflected mostly in "notes payable" to WGTI from Greenwood and Walsh, as well as some other investments and entities that Greenwood and Walsh appear to own and control.

20. The notes payable consisted of $554 million in personal promissory notes signed by Greenwood and Walsh. These personal promissory notes date as far back as 1996 and stated that they were payable to WGTI by Greenwood (in the amount of $293 million) and Walsh (in

the amount of $261 million).

21.     Greenwood and Walsh essentially used the WGTI investors' account as their personal "piggy-bank." For years, they systematically looted the WGTI investors' account and used the investors' money to fund various business ventures for themselves and their family and to live luxurious lifestyles, which included multi-million dollars homes, a horse farm, cars, horses and expensive collectible items.

### Defendant Aided And Abetted Greenwood And Walsh In Perpetrating Their Investment Fraud

22.     Duffy was the Chief Compliance Officer at WGTC since at least 1996. She also served as a bookkeeper for both WGTI and WGTC. Duffy used her positions at WGTC and WGTI to knowingly assist Greenwood and Walsh perpetrate their investment fraud.

23.     Beginning in the mid-to-late 1990's, Duffy wired funds, at the direction of Greenwood and Walsh, from WGTI's account to various accounts controlled by Greenwood and Walsh. Duffy took all of the steps necessary to create the paperwork and to effect the wire transfers on behalf of Greenwood and Walsh. In doing so, she fully understood that the wire transfers constituted the unauthorized use of investor assets by Greenwood and Walsh, and that she was helping them misappropriate investors' assets that should have been sent to WGTC for use in the index arbitrage trading strategy.

24.     In order to keep track of how much money Greenwood and Walsh were misappropriating, Duffy decided to record the misappropriated amounts as "notes receivables" from Greenwood and Walsh on WGTI's books. Duffy created annual "promissory notes" that were signed by Greenwood and Walsh and were payable to WGTI. The promissory notes represented the amount of investor assets Greenwood and Walsh were misappropriating.

25. Each year, Duffy prepared the "promissory notes" for Greenwood and Walsh, and she insisted that they sign them in order keep a record of the hundreds of millions of dollars they were taking from the WGTI investors' account.

26. In total, Greenwood and Walsh each signed thirteen promissory notes in which they collectively "promised" to repay WGTI a total of $554 million. Greenwood's notes totaled $293 million, and Walsh's notes totaled $261 million. The notes purported to reflect the "general partner's share of losses, withdrawals and payments" during the previous year. The notes, however, did not provide for interest payments on the principal, nor did they bear any of the terms and conditions one would expect to find in bona fide promissory notes.

27. Duffy was highly compensated for her role in assisting Greenwood and Walsh misappropriate investors' assets. Greenwood and Walsh paid her an annual salary and bonus of several hundred thousand dollars. For 2008, Duffy received as much as $800,000 in salary and bonus.

28. In addition to assisting Greenwood and Walsh misappropriate nearly $554 million of investor funds, Duffy took as much $292,000 of the investors' money for herself. Between March 2000 and April 2008, Duffy wired these funds from WGTI's account into accounts she controlled, or directly to third-parties to pay for personal items she purchased, including several pieces of expensive artwork.

## FIRST CLAIM FOR RELIEF
### Aiding and Abetting Violations of
### Section 10(b) of the Exchange Act and Rule 10b-5

29. Paragraphs 1 through 28 are re-alleged and incorporated by reference as if fully set forth herein.

30. Greenwood and Walsh, in connection with the purchase and sale of securities, directly and indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, knowingly or recklessly have employed devices, schemes and artifices to defraud; have made untrue statements of material fact and have omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and have engaged in acts, practices and courses of business which operate as a fraud and deceit upon investors.

31. Defendant knowingly provided substantial assistance to Greenwood and Walsh in the commission of these violations.

32. By reason of the activities described, Defendant aided and abetted Greenwood and Walsh's violations of Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5].

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting Violations of Sections 206(1) and 206(4) of the Advisers Act

33. Paragraphs 1 through 32 are re-alleged and incorporated by reference as if fully set forth herein.

34. Greenwood and Walsh, as investment advisers, directly and indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, knowingly or recklessly have employed devices, schemes and artifices to defraud investors, and have engaged in transactions, practices and courses of business which operated as a fraud and deceit upon these investors.

35. Defendant knowingly provided substantial assistance to Greenwood and Walsh in

Case 1:09-cv-06458-GBD   Document 1   Filed 07/21/2009   Page 11 of 12

the commission of these violations.

36. By reason of the activities described herein, Defendant aided and abetted Greenwood and Walsh's violations of Sections 206(1) and 206(2) Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

### I.

A Final Judgment permanently restraining and enjoining Defendant, her agents, servants, employees and attorneys and all persons in active concert or participation with her who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating and aiding and abetting violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### II.

A Final Judgment ordering Defendant to disgorge her ill-gotten gains from the conduct alleged herein, plus prejudgment interest.

### III.

A Final Judgment ordering Defendant to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### IV.

Such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        July 21, 2009

By: _____
David Rosenfeld
Associate Regional Director
New York Regional Office
Attorney for Plaintiff
Securities and Exchange Commission
3 World Financial Center, Suite 400
New York, New York 10281-1022
Telephone: (212) 336-1100
Email: rosenfeldd@sec.gov

Of Counsel
George Stepaniuk
Paul Gizzi
Joseph Dever
Thomas P. Smith, Jr.